**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| AMANDA PRUITT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DEACONESS HEALTH SYSTEM, INC., and AESTO, LLC, d/b/a AESTO HEALTH,<br><br>Defendants. | Case No. 1:26-cv-1731<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

Plaintiff Amanda Pruitt ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through her attorneys, brings this Class Action Complaint against Defendants Deaconess Health System, Inc. ("Deaconess") and Aesto, LLC, d/b/a Aesto Health ("Aesto" and with Deaconess, "Defendants") and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

**INTRODUCTION**

1. Plaintiff brings this class action against Defendants for their failure to secure and safeguard the personally identifying information ("PII") and personal health information ("PHI," and together with PII, "Private Information") of Plaintiff and Class members, including their: names, dates of birth, medical information, driver's license numbers, financial account numbers, health insurance information, individual taxpayer identification numbers, other government identification numbers, and Social Security numbers.

2. Deaconess is a health system that operates in Indiana, Illinois, and Kentucky. Deaconess contracts with third-party vendors, such as Aesto, for various services. Aesto provides healthcare data migration and archiving services for its customers.

3. Between approximately December 2, 2025, and December 18, 2025, unauthorized individuals gained access to Aesto's networks and accessed and copied the Private Information of certain of Aesto's customers' patients, including Plaintiff and Class members (the "Data Breach").

4. Defendants owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their Private Information against unauthorized access and disclosure, including ensuring that their third-party vendors would adequately protect Plaintiff's and Class members' Private Information. Defendants breached that duty by, among other things, failing to, or sharing Private Information with third parties that failed to, implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' Private Information from unauthorized access and disclosure.

5. As a result of Defendants' inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' Private Information was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all persons whose Private Information was exposed as a result of the Data Breach.

6. Plaintiff, on behalf of herself and all other Class members, asserts claims for negligence, negligence per se, breach of implied contract, breach of fiduciary duty, unjust enrichment, and violation of the Indiana Deceptive Consumer Sales Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Amanda Pruitt***

7. Plaintiff is a citizen and resident of Kentucky.

8. Plaintiff is a patient of Deaconess. As a condition of providing services to Plaintiff, Deaconess required Plaintiff to provide it with her Private Information.

9. Based on representations made by Deaconess, Plaintiff believed that Deaconess had implemented and maintained reasonable security practices to protect her Private Information. With this belief in mind, Plaintiff provided her Private Information to Deaconess in exchange for receiving services from Deaconess. Deaconess in turn shared this information with Aesto in connection with receiving services from Aesto.

10. Deaconess shared Plaintiff's Private Information with Aesto, which stored and maintained Plaintiff's Private Information on its network systems, including the systems impacted in the Data Breach.

11. Plaintiff received a notice letter from Deaconess notifying her that her Private Information was in the files accessed and acquired by an unauthorized third party in the Data Breach.

12. Had Plaintiff known that Deaconess and its third-party vendors do not adequately protect the Private Information they collect and maintain, she would not have agreed to provide her Private Information to, or obtained services from, Deaconess.

13. As a result of the Data Breach, Plaintiff has experienced a significant increase in the amount of spam emails and calls she receives.

14. As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft;

the wrongful disclosure and loss of confidentiality of her highly sensitive Private Information; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of her Private Information.

***Defendant Deaconess Health System, Inc.***

15. Defendant Deaconess Health System, Inc. is an Indiana nonprofit corporation with its principal place of business located at 600 Mary St., Evansville, Indiana 47747.

***Defendant Aesto, LLC***

16. Defendant Aesto, LLC is a Delaware limited liability company with its principal place of business located at 1800 International Park Drive, Suite 110, Birmingham, AL 35243.

## JURISDICTION AND VENUE

17. The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

18. This Court has personal jurisdiction over Deaconess because Deaconess is organized under the laws of this State and maintains its principal place of business in this State.

19. The Court has personal jurisdiction over Aesto because it transacts business in this State and contracts for goods or services in this State.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Deaconess's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

# FACTUAL ALLEGATIONS

## *Overview of Defendants*

21. Deaconess is a fully integrated multispecialty group featuring primary care physicians and specialty doctors.[1] Deaconess operates across 23 hospitals, 260 locations, and has more than 1,700 doctors.[2]

22. Aesto is a data company that was created in 2018 and claims to provide "the industry's most comprehensive platform for extracting, transforming, and archiving healthcare data from over 200 different IT systems."[3]

23. In the regular course of its business, Deaconess collects and maintains the Private Information of its patients, including Plaintiff's and Class members. Deaconess requires its patients to provide it with their Private Information, including the information stolen in the Data Breach, before it provides them services.

24. Deaconess's website contains a Joint Notice of Privacy Practices (the "Privacy Policy") describing how Deaconess may use and disclose patients' Private Information, including for treatment, payment, and healthcare operations.[4] Deaconess also maintains a separate privacy notice governing certain Deaconess Illinois entities and an addendum governing substance-use-

---

[1] *About Us*, DEACONESS, https://www.deaconess.com/about-us (last accessed Aug. 17, 2026).
[2] DEACONESS, https://www.deaconess.com (last accessed Aug. 17, 2026).
[3] *About Us*, Aesto, https://www.aestohealth.com/about-us/ (last accessed Aug. 17, 2026).
[4] *Deaconess Joint Notice of Privacy Practices*, DEACONESS, https://www.deaconess.com/getcontentasset/d3f74b91-2674-43c4-a747-7940c1337524/5675f749-da0d-4143-b58b-9f9b6d59d84c/notice-of-privacy-practices-dhs.pdf?language=en-US (last accessed Aug. 17, 2026).

disorder treatment records maintained by Deaconess's specialized substance-use-disorder programs.[5]

25. Deaconess acknowledges that "PHI gathered by the persons treating you is entered into your record" and used to determine the patient's plan of care and progress.[6] Deaconess also uses patients' PHI to verify insurance coverage, process payment, perform healthcare operations, and coordinate patient care.[7]

26. Deaconess represents that its Joint Notice of Privacy Practices applies to all health records that it maintains for its patients and describes the circumstances under which Deaconess may use or disclose patients' Private Information with or without their permission.[8]

27. Deaconess further represents that, when it discloses patients' Private Information to contracted parties performing services on its behalf, those parties are "obligated by law and contract to protect your PHI."[9] Deaconess also represents that uses and disclosures not covered by its Privacy Policy or applicable law "will be made only with your written permission."[10]

28. Deaconess acknowledges that it is required by law to maintain the confidentiality of patients' PHI, provide patients with notice of its privacy practices and legal duties, follow the

---

[5] *Deaconess Illinois Joint Notice of Privacy Practices*, DEACONESS, https://www.deaconess.com/getcontentasset/ebc3a06f-d213-42ad-8caf-e576918e83d9/5675f749-da0d-4143-b58b-9f9b6d59d84c/dil-joint-notice-of-privacy-practices-8-5x11-f9803.pdf?language=en-US (last accessed Aug. 17, 2026); *42 CFR Part 2 Addendum to Deaconess Health System Notice of Privacy Practices*, DEACONESS, https://www.deaconess.com/getcontentasset/2585cbb2-7853-4ca5-b8e9-c513586dd575/5675f749-da0d-4143-b58b-9f9b6d59d84c/part-2-program-notice-of-privacy-practices-addendum-dhs.pdf?language=en-us (last accessed Aug. 17, 2026).

[6] *Deaconess Joint Notice of Privacy Practices*, supra note 4.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Deaconess Illinois Joint Notice of Privacy Practices*, supra note 5.

terms of its current Privacy Policy, and notify patients if their unsecured PHI has been breached.[11] With respect to substance-use-disorder treatment records, Deaconess similarly acknowledges that it is "required by law to maintain the privacy of Part 2 Records" and to "notify affected patients following a breach of unsecured records."[12]

29. Aesto also maintains a privacy policy for its "users, customers, and partners."[13] It claims to its customers that it "employ[s] industry-standard technical and organizational measures to safeguard your personal information" and that "Aesto Health implements appropriate safeguards to protect data in accordance with applicable legal and regulatory requirements."[14]

30. Plaintiff and Class members are current or former patients of Deaconess or other healthcare entities who provided their Private Information to Deaconess or other healthcare entities in exchange for obtaining healthcare services.

***The Data Breach***

31. Between approximately December 2, 2025, and December 18, 2025, an unauthorized third party gained access to Aesto's network systems and exfiltrated the Private Information maintained by Aesto, including information Aesto maintained on behalf of its clients.[15] The personal information exfiltrated in connection with the Data Breach includes "full names, dates of birth, medical information, driver's license numbers, financial account numbers only, health insurance information, individual taxpayer identification numbers, other government identification

[11] *Deaconess Joint Notice of Privacy Practices*, supra note 4.
[12] *42 CFR Part 2 Addendum to Deaconess Health System Notice of Privacy Practices*, supra note 5.
[13] *Aesto Health Privacy Notice*, Aesto Health, https://www.aestohealth.com/privacy-policy/ (last accessed Aug. 17, 2026).
[14] *Id.*
[15] *Notice of Data Security Incident*, AESTO HEALTH, https://www.aestohealth.com/notice-of-data-security-incident-12-18-25/ (last accessed Aug. 17, 2026).

numbers, and Social Security numbers."[16]

32. A subset of the PII that was released to cybercriminals in the Data Breach belonged to Deaconess's patients, including Plaintiff and Class members, putting them at risk of imminent identity fraud, if they have not already experienced it. Despite the intrusion occurring in December 2025, Deaconess waited until approximately June 26, 2026 to begin notifying Plaintiff and Class members that the Data Breach occurred and that their Private Information was accessed and acquired by unauthorized persons.

33. Defendants' failure to promptly notify Plaintiff and Class members that their PII was disclosed, accessed, and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***Defendants Knew that Criminals Target Private Information***

34. At all relevant times, Defendants knew, or should have known, that the Private Information that they collect and store was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures, including ensuring that their third-party vendors maintain reasonable and appropriate data privacy and security measures, to protect Plaintiff's and Class members' Private Information from unauthorized disclosures and cyberattacks that they should have anticipated and guarded against.

---

[16] *Id.*

35. It is well known amongst companies that store sensitive personally identifying information that sensitive information—such as the Private Information stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[17]

36. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in 2024.[18] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[19]

37. Private Information is a valuable property right.[20] The value of Private Information as a commodity is measurable.[21] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[22] American companies are estimated to have spent over $19

---

[17] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[18] *Data Breach Outlook*, KROLL, https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025 (last accessed Aug. 17, 2026).

[19] *See id.*

[20] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[21] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[22] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

billion on acquiring personal data of consumers in 2018.[23] It is so valuable to identity thieves that once Private Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

38. As a result of its real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, Private Information, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

39. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[24] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[25] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[26]

40. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account

[23] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[24] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("*What Happens to Stolen Healthcare Data* Article") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[25] *Id.*

[26] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[27] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[28]

41. Criminals can use stolen Private Information to extort a financial payment by "leveraging details specific to a disease or terminal illness."[29] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[30]

42. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[31]

---

[27] SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[28] Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[29] *What Happens to Stolen Healthcare Data*, *supra* at note 25.

[30] *Id.*

[31] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

43. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Theft of Private Information Has Grave and Lasting Consequences for Victims***

44. Theft of Private Information is serious. The FTC warns consumers that identity thieves use Private Information to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[32]

45. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[33]

46. Identity theft is not an easy problem to solve. In a 2025 survey, the Identity Theft Resource Center found that 20% of victims of identity misuse needed more than 30 days to resolve issues stemming from identity theft and 13% required three months or more.[34]

47. Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records

---

[32] *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Aug. 17, 2026).

[33] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[34] Identity Theft Resource Center, *2025 Consumer Impact Report*, IDENTITY THEFT RES. CTR. (2025), https://www.idtheftcenter.org/publication/itrc-2025-consumer-impact-report/ (last accessed Aug. 17, 2026).

that can plague victims' medical and financial lives for years."[35] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[36] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use Private Information "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[37] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[38]

48. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

> a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.
>
> b. Significant bills for medical goods and services neither sought nor received.
>
> c. Issues with insurance, co-pays, and insurance caps.
>
> d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.
>
> e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

---

[35] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.
[36] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 29.
[37] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Aug. 17, 2026).
[38] *Id.*

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[39]

49. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[40]

50. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their Private Information is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiff and Class Members***

51. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the disclosure, compromise, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required

[39] *See* Dixon & Emerson, *supra* note 36.

[40] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

to prevent, detect, and repair the impact of the Private Information compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## CLASS ALLEGATIONS

52. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

53. Plaintiff brings this action on behalf of herself and all members of the following Class of similarly situated persons:

> All persons whose Private Information was accessed by and disclosed in the Data Breach to unauthorized persons, including all persons who were sent a notice of the Data Breach (the "Class").

54. Plaintiff also brings this action on behalf of herself and all members of the following subclass of similarly situated persons:

> All persons who are patients or former patients of Deaconess Health System, Inc. and whose Private Information was accessed by and disclosed in the Data Breach to unauthorized persons, including all persons who are patients or former patients of Deaconess Health System, Inc. and were sent a notice of the Data Breach (the "Deaconess Subclass").

55. Excluded from the Class are Deaconess Health System, Inc. and its affiliates, parents, subsidiaries, officers, agents, and directors; Aesto, LLC, d/b/a Aesto Health, and its affiliates, parents, subsidiaries, officers, agents, and directors; as well as the judge(s) presiding over this matter and the clerks of said judge(s).

56. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

57. The members in the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. On information and belief, thousands of individuals' Private Information was compromised and stolen in the Data Breach.

58. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendants had a duty to adequately safeguard the Private Information of Plaintiff and Class members;

b. Whether Defendants breached their duty to adequately safeguard the Private Information of Plaintiff and Class members;

c. Whether an implied contract existed between Class members and Deaconess providing that Deaconess would implement and maintain reasonable security measures to protect and secure Class members' Private Information from unauthorized access and disclosure;

d. Whether Defendants were unjustly enriched due to their promises to safeguard Class members' Private Information and its failure to do so;

e. Whether Deaconess's actions were deceptive, unfair, or abusive under the Indiana Deceptive Consumer Sales Act; and

f. Whether Plaintiff and all other Class members are entitled to damages and the measure of such damages and relief.

59. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and all other Class members. Individual

questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

60. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her Private Information compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

61. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that Plaintiff has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

62. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**CAUSES OF ACTION**
**COUNT I**
**NEGLIGENCE**

63. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

64. Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the Private Information in their possession, custody, or control. This duty arose upon Defendants' acceptance and retention of the Private Information of Plaintiff and Class members as part of their business operations.

65. Among the specific duties Defendants owed Plaintiff and Class members were duties to:

a. exercise reasonable care in collecting, retaining, securing, protecting, and disposing of PII in their possession;

b. protect Private Information using security procedures and systems compliant with applicable legal requirements and industry-standard practices;

c. ensure that third-party vendors adequately safeguard the Private Information that Defendants provide to the vendors; and

d. promptly notify Plaintiff and Class members upon discovering that their Private Information had been compromised.

66. Defendants knew that the Private Information Plaintiff and Class members provided was sensitive and that inadequate security practices would subject Plaintiff and Class members—who had no alternative but to trust Defendants and Defendants' vendors with their data—to foreseeable and substantial risk of harm.

67. Defendants knew or should have known the risks of collecting and storing Plaintiff's and all other Class members' Private Information and the importance of ensuring that their third-party vendors maintain secure systems. Defendants knew or should have known of the many data breaches that targeted companies that collect and store Private Information in recent years.

68. Only Defendants were in a position to ensure that their, or their third-party vendors', systems were sufficient to protect the Private Information that Plaintiff and Class members had entrusted to their care. This asymmetry of control establishes a special relationship between Defendants and Class members that independently supports the imposition of a duty of care.

69. Defendants also had independent duties under state and federal laws requiring Defendants to reasonably safeguard, or ensure that their third-party vendors reasonably safeguard, the Private Information of Plaintiff and Class members and to promptly notify them of any data breach. These duties are untethered to any contract between the parties.

70. Given the nature of Defendants' businesses, the sensitivity and value of the Private Information they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities in their systems or their third-party vendors' inadequate data security and prevented the Data Breach from occurring or should not have provided Private Information to third-party vendors with inadequate data security.

71. Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' Private Information by failing to, or failing to ensure that their third-party vendors, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures,

protocols, and software and hardware systems to safeguard and protect Private Information entrusted to them—including Plaintiff's and Class members' Private Information.

72. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' Private Information by failing to, or failing to ensure that their third-party vendors, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' Private Information to unauthorized individuals.

73. But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their Private Information would not have been compromised.

74. As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT II
## NEGLIGENCE PER SE

75. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

76. Pursuant to HIPAA, Defendants had a duty to comply with HIPAA's Privacy and Security Rules when in possession of Plaintiff's and Class members' Private Information. *See* 45 C.F.R. Part 160 and Part 164, Subparts A, C, and E.

77. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the failure by businesses to employ reasonable measures to protect consumers' sensitive personal data. *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

78. Pursuant to the FTC Act and the FTC's published guidance and enforcement precedent, Defendants had a duty to implement and maintain reasonable data security measures to protect the Private Information of Plaintiff and Class members, including ensuring that their third-party vendors maintain adequate data security. Defendants violated this duty as described herein.

79. Pursuant to the FTC Act and pursuant to HIPAA, Defendants were required by law to maintain adequate and reasonable measures to maintain the security and privacy of Plaintiff's and Class members' Private Information.

80. The harm suffered by Plaintiff and Class members, including the exposure and potential misuse of their Private Information, resulting in a substantial risk of identity theft,

financial fraud, and tax fraud, is precisely the type of harm that Section 5 of the FTC Act and HIPAA are designed to prevent.

81. Defendants' violation of Section 5 of the FTC Act and HIPAA constitutes negligence per se.

82. But for Defendants' negligent breach of their statutory duties, Plaintiff and Class members would not have suffered the injuries described herein.

83. The injuries suffered by Plaintiff and Class members were the reasonably foreseeable result of the Defendants' breach. Defendants knew or should have known that their failure to, or their failure to ensure that its third-party vendors, maintain adequate data security would expose Plaintiff and Class members to precisely these harms.

84. As a direct and proximate result of Defendants' negligence per se, Plaintiff and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(Against Deaconess individually and on behalf of the Deaconess Subclass)**

85. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

86. Plaintiff brings this claim individually and on behalf of the Deaconess Subclass against Deaconess only.

87. In connection with receiving medical treatment or services, Plaintiff and all other Deaconess Subclass members entered into implied contracts with Deaconess.

88. Pursuant to these implied contracts, Plaintiff and Deaconess Subclass members paid money to Deaconess, whether directly or through their insurers, and provided Deaconess with their Private Information. In exchange, Deaconess agreed to, among other things, and Plaintiff understood that Deaconess would: (1) provide medical treatment services to Plaintiff and Deaconess Subclass members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Deaconess Subclass members' Private Information, including ensuring that its third-party vendors adequately protect Private Information; and (3) protect Plaintiff's and Deaconess Subclass members' Private Information in compliance with federal and state laws and regulations and industry standards.

89. The protection of Private Information was a material term of the implied contracts between Plaintiff and Deaconess Subclass members, on the one hand, and Deaconess, on the other hand. Indeed, as set forth *supra*, Deaconess recognized the importance of data security and the privacy of its patients' Private Information in its Notice of Privacy Practices. Had Plaintiff and Deaconess Subclass members known that Deaconess would not

adequately protect its patients' Private Information, they would not have received medical treatment or services from Deaconess.

90. Plaintiff and Deaconess Subclass members performed their obligations under the implied contracts when they provided Deaconess with their Private Information and paid—directly or through their insurers—for health care treatment or services from Deaconess.

91. Deaconess breached its obligations under its implied contracts with Plaintiff and Deaconess Subclass members in failing to implement and maintain reasonable security measures to protect and secure their Private Information and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Deaconess Subclass members' Private Information in a manner that complies with applicable laws, regulations, and industry standards.

92. Deaconess's breach of its obligations of its implied contracts with Plaintiff and Deaconess Subclass members directly resulted in the Data Breach and the injuries that Plaintiff and all other Deaconess Subclass members have suffered from the Data Breach.

93. Plaintiff and all other Deaconess Subclass members were damaged by Deaconess's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their Private Information was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their Private Information has been breached; (v) they were deprived of the value of their Private Information, for which there is a well-established national and international market; and/or

(vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT IV
## BREACH OF FIDUCIARY DUTY

94. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

95. Plaintiff brings this claim individually and on behalf of the Deaconess Subclass against Deaconess only.

96. Plaintiff and Deaconess Subclass members gave Deaconess their Private Information in confidence, believing that Deaconess would protect that information. Plaintiff and Deaconess Subclass members would not have provided Deaconess with this information had they known it would not be adequately protected. Deaconess's acceptance and storage of Plaintiff's and Deaconess Subclass members' Private Information created a fiduciary relationship between Deaconess and Plaintiff and Deaconess Subclass members. In light of this relationship, Deaconess must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiff's and Deaconess Subclass members' Private Information.

97. Due to the nature of the relationship between Deaconess and Plaintiff and Deaconess Subclass members, Plaintiff and Deaconess Subclass members were entirely reliant upon Deaconess to ensure that their Private Information was adequately protected. Plaintiff and Deaconess Subclass members had no way of verifying or influencing the nature and extent of Deaconess's or its third-party vendors' data security policies and practices, and Deaconess was in an exclusive position to guard against the Data Breach.

98. Deaconess has a fiduciary duty to act for the benefit of Plaintiff and Deaconess Subclass members upon matters within the scope of their relationship. It breached that duty by failing to, and sharing Private Information with third-party vendors who failed to, properly protect the integrity of the system containing Plaintiff's and Deaconess Subclass members' Private Information, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Deaconess Subclass members' Private Information that it collected and shared.

99. As a direct and proximate result of Deaconess's breaches of its fiduciary duties, Plaintiff and Deaconess Subclass members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information which remains in Deaconess's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT V
## UNJUST ENRICHMENT

100. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

101. This claim is pleaded in the alternative to the breach of implied contract claim.

102. Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of monies paid to Deaconess for healthcare services and through the provision of their Private Information, which Deaconess in turn used to pay Aesto for its services. Plaintiff did so with an implicit understanding that Defendants would use some of these payments to protect the Private Information they collect, store, and use to provide health care.

103. Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class members. Defendants also benefitted from the receipt of Plaintiff's and Class members' Private Information, as this was used to facilitate their business operations and billing services.

104. As a result of Defendants' conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that they paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

105. Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to, or shared Private Information with third-party vendors who failed to, adequately implement the data privacy and security procedures for themselves that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

106. Plaintiff and Class members have no adequate remedy at law.

107. Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

**COUNT VI**
**VIOLATIONS OF THE INDIANA DECEPTIVE CONSUMER SALES ACT**
**IND. CODE §§ 24-5-0.5-1 *et seq*. ("IDCSA")**
**(Against Deaconess individually and on behalf of the Deaconess Subclass)**

108. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

109. Plaintiff brings this claim individually and on behalf of the Deaconess Subclass against Deaconess only.

110. The IDCSA prohibits suppliers from engaging in deceptive, unfair, and abusive acts or omissions in consumer transactions. Ind. Code § 24-5-0.5-3(a).

111. Deaconess is a "supplier" who engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of "consumer transactions," in violation of the IDCSA. As a regular part of its business, Deaconess sells and provides medical and health services. It accepts payments from customers and patients, like Plaintiff and Deaconess Subclass members, for services rendered at its medical, health, and other treatment centers. Plaintiff's and Deaconess Subclass members' transactions were directed towards Indiana, and on information and belief, those transactions were processed in Indiana and the information resulting from those transactions was stored in Indiana.

112. In connection with its consumer transactions, Deaconess engaged in unfair, abusive, or deceptive acts, omissions, or practices by, *inter alia*, engaging in the following conduct:

a. Failing to ensure that its third-party vendors maintain sufficient security to keep sensitive Private Information of Plaintiff and the Deaconess Subclass from being hacked and stolen;

b. Misrepresenting material facts to Plaintiff and the Deaconess Subclass in connection with the sale of goods and services, by representing that it would maintain adequate data privacy and security practices and procedures to safeguard Private Information from unauthorized disclosure, release, data breaches, and theft, including, but not limited to, through the promises and assurances made in its Notice of Privacy Practices;

c. Misrepresenting material facts to Plaintiff and the Deaconess Subclass in connection with the sale of goods and services, by representing that Deaconess did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Private Information, which requirements included, but are not limited to, those imposed by laws such as the Federal Trade Commission Act (15 U.S.C. § 45) and Indiana's data breach statute (Ind. Code § 24-4.9-3-3.5); and

d. Failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiff's and Deaconess Subclass members' Private Information from unauthorized disclosure, release, data breaches, and theft.

113. Deaconess knew or should have known that its third-party vendors' computer systems and data security practices were inadequate to safeguard the information of Plaintiff and Deaconess Subclass members, and that the risk of data breach or theft was highly likely. Nevertheless, Deaconess did nothing to warn them about its third-party vendor's data privacy shortcomings, and instead affirmatively promised that it would maintain adequate security.

This was a deliberate effort to mislead patients such as Plaintiff and Deaconess Subclass members in order to encourage them to pay for and obtain health and medical services from Deaconess even though it knew that patient Private Information was vulnerable to a data breach.

114. The above unfair and deceptive practices and acts were done as part of a scheme, artifice, or device with intent to defraud or mislead and constitute incurable deceptive acts under the IDCSA.

115. As a direct and proximate result of Deaconess's deceptive trade practices, Plaintiff and the Deaconess Subclass members suffered injuries and damages, including the loss of their legally protected interest in the confidentiality and privacy of their Private Information, and damages.

116. As a direct and proximate result of Deaconess's deceptive trade practices, Plaintiff and Deaconess Subclass members are now likely to suffer identity theft crimes, and they face a lifetime risk of identity theft and fraud.

117. The IDCSA defines an "incurable deceptive act" as "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code § 24-5-0.5-2(8). Deaconess's failure to ensure its third-party vendors adequately safeguard Plaintiff's and the Deaconess Subclass members' Private Information is an "incurable deceptive act" under the IDCSA.

118. Plaintiff and Deaconess Subclass members seek relief under Ind. Code § 24-5-0.5-4, including, but not limited to, damages, restitution, penalties, injunctive relief, and attorneys' fees and costs.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in her favor and against Defendants as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard Private Information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: August 18, 2026

Respectfully submitted,

*/s/ Russell B. Cate*
William N. Riley (#14941-49)
Russell B. Cate (#27056-29)
**RILEYCATE, LLC**
11 Municipal Drive, Suite 320
Fishers, IN 46038
Telephone: 317.588.2866
Facsimile: 317.458.1785
Email: wriley@rileycate.com
rcate@rileycate.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiff*

**Pro hac vice* forthcoming